**EXHIBIT 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES BULTEMA                                    MISC NO.

        Movant,

v.

U.S. DEPARTMENT OF JUSTICE

        Respondent.

_____/

Scott E. Dwyer (P33131)
Brendan P. Karl (P86612)
Mika Meyers PLC
Attorneys for Movant James R. Bultema
900 Monroe Avenue, NW
Grand Rapids, MI 49503
(616) 632-8000
sdwyer@mikameyers.com
bkarl@mikameyers.com

_____/

**SWORN STATEMENT OF JAMES R. BULTEMA**

I, James R. Bultema, hereby state as follows:

1.    I am presently a customer of JP Morgan Chase Bank (including, based on information and belief, JPMorgan Chase Bank, N.A.) and am the customer whose records are being requested by the United States Government by and through the U.S. Department of Justice ("DOJ").

2.    The financial records sought by the DOJ are not relevant to the legitimate law enforcement inquiry stated in the Customer Notice that was sent to me (assuming, without admitting, there was a legitimate law enforcement inquiry stated at all). For instance, the Civil

Investigative Demand covers too much time. Upon information and belief, January 1, 2020 was before a loan application was submitted to the Small Business Administration related to any COVID-19 Economic Injury Disaster Loan ("EIDL") or Paycheck Protection Program ("PPP") Loan involving me or Matchbox Business, LLC, OBI Business, LLC, or Mermaid Business, LLC.

3.      Plus, the Civil Investigative Demand seeks too many categories of things that are not relevant at all—like safe deposit box records, credit card records, "[a]ll correspondence with the above person and/or with third parties regarding the above person," and "[a]ll memoranda, notes, files, or records relating to meetings or conversations concerning the above person," and other things. This infringes on my rights. It also sweeps up information regarding jointly held, personal accounts that belong to my family members and me.

4.       Additionally, the financial records sought by the DOJ should not be disclosed because there has not been substantial compliance with the Right to Financial Privacy Act of 1978, 12 U.S.C. § 3401, *et seq.* (the "RFPA") in that the notice of subpoena never identifies my alleged receipt of loan funds or control or authority over a company's use of loan funds. So, the DOJ provided legally insufficient notice in violation of the RFPA.

5.      Lastly, there is not a legitimate law enforcement inquiry because the DOJ already knows how loan proceeds were used or can discover information about that without violating the RFPA by seeking financial records from the companies, during the relevant time period, using sufficiently tailored civil investigative demands that comport with the RFPA. In other words, the DOJ has not demonstrated why it needs my personal financial records at all (it does not) because I'm not linked to any wrongdoing.

6.      Although I was a member of some of the companies that applied for PPP or EIDL loans, Eric Chaitin was the one who exercised authority over how to use the funds. Furthermore,

my role in the companies ended when I had my membership interests in them redeemed as part of a deal where I received payment from the companies as stated in the Master Agreement, a true and accurate copy of which is attached as **Exhibit A**. A company is permitted to make payments for non-federal debt (i.e., loans from me) using EIDL or PPP loan proceeds. Similarly, a company is permitted to make payment for outstanding wages (as working capital).

7.      In fact, the Small Business Administration ("SBA") and  U.S. Department of the Treasury ("Treasury") even say so on their websites.[1] Here are screenshots that fairly and accurately depict what those websites show, in relevant sections:

## Loan details

In response to COVID-19, small business owners, including agricultural businesses, and nonprofit organizations in all U.S. states, Washington D.C., and territories were able to apply for the COVID-19 Economic Injury Disaster Loan (EIDL). New applications are no longer being accepted.

| Product | Loan directly from SBA that must be repaid; low-interest, fixed-rate, long-term loan to help overcome the effects of the pandemic by providing working capital to meet operating expenses |
| --- | --- |
| Uses of Proceeds | Working capital to make regular payments for operating expenses, including payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt incurred at any time (past, present, or future) |

(**Demonstrative Exhibit B**: Screenshot of the SBA COVID-19 EIDL Policy online.)

---

[1] Those websites are accessible, as of the date of this sworn statement, at: https://www.sba.gov/funding-programs/loans/covid-19-relief-options/covid-19-economic-injury-disaster-loan/about-covid-19-eidl#id-loan-details and https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheckprotection-program#:~:text=Small%20Business%20Paycheck%20Protection%20Program&text=Funds%20can%20also%20be%20used,retention%20and%20certain%20other%20expenses.

3

## Program updates

As of September 8, 2021, new COVID-19 EIDL policy changes took effect as follows:

- Maximum loan cap increased from $500,000 to $2 million
- Use of funds was expanded to include payment and pre-payment of business non-federal debt incurred at any time (past or future) and payment of federal debt
- Extend the deferment period to 24 months from origination for all loans (existing loans with a less than 24-month deferment will be adjusted)
- Affiliation requirements simplified to an affiliate is a business that you control or in which you have 50% of more ownership
- Developed additional path to meet program size standards for businesses assigned a NAICS code beginning with 61, 71, 72, 213, 3121, 315, 448, 451, 481, 485, 487, 511, 512, 515, 532, or 812
- Exclusivity Period: From September 8, 2021, to October 8, 2021, the above policy changes were applicable to applications for <$500K while applications for >$500K received the policy changes on and after October 8, 2021

(**Demonstrative Exhibit C**: Screenshot of the SBA COVID-19 EIDL Policy online.)


## SMALL BUSINESS PAYCHECK PROTECTION PROGRAM

The Paycheck Protection Program established by the CARES Act, is implemented by the Small Business Administration with support from the Department of the Treasury.  This program provides small businesses with funds to pay up to 8 weeks of payroll costs including benefits. Funds can also be used to pay interest on mortgages, rent, and utilities.

The Paycheck Protection Program prioritizes millions of Americans employed by small businesses by authorizing up to $659 billion toward job retention and certain other expenses.

Small businesses and eligible nonprofit organizations, Veterans organizations, and Tribal businesses described in the Small Business Act, as well as individuals who are self-employed or are independent contractors, are eligible if they also meet program size standards.

(**Demonstrative Exhibit D**: Screenshot of the Treasury's Policy Issues online.)

8.    Additionally, the SBA and Treasury published a Frequently Asked Questions (FAQs) on PPP Loan Forgiveness fact sheet online,[2] a true and accurate copy of which is attached as **Exhibit E**.

9.    The DOJ only provided me with a cursory and legally insufficient notice of its purpose supporting the civil investigative demands, a copy of which is attached to the motion as **Exhibit 2**, Notice of Subpoena Enclosing October 2024 CID.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 11, 2024

James R. Bultema

---

[2]    As of the date of this sworn statement, it is accessible at: https://home.treasury.gov/system/files/136/PPP--Loan-Forgiveness-FAQs.pdf .

5

{03561842 6 }

DocuSign Envelope ID: 78C68AAC-3E4C-42CA-84FB-2D57EF024ECC

# EXHIBIT A

## MASTER AGREEMENT

THIS MASTER AGREEMENT (the "**Agreement**") is entered into effective this 1st day of July, 2021 (the "**Effective Date**"), between James R. Bultema ("**Jim**"), Eric A. Chaitin ("**Eric**"), Matchbox Business LLC, a Michigan limited liability company ("**Matchbox**"), Mermaid Business LLC, a Michigan limited liability company ("**Mermaid**"), OBI Business L.L.C., a Michigan limited liability company ("**OBI**", and, together with Matchbox and Mermaid, the "**Companies**"), River and Odi Properties LLC, a Michigan limited liability company ("**River and Odi**"), John Bultema ("**John**"), and Robert William, LLC, a Michigan limited liability company ("**Robert William**").

## <u>Recitals</u>

A.      Prior to giving effect to the transactions contemplated by this Agreement, the membership interest in Matchbox is owned 50% by Jim, and 50% by Eric.

B.      Prior to giving effect to the transactions contemplated by this Agreement, the membership interest in Mermaid is owned 50% by Jim, and 46.9% by Eric, and 3.1% by Stephen Chaitin ("**Steve**").

C.      Prior to giving effect to the transactions contemplated by this Agreement, the membership interest in OBI is owned 51% by Jim, and 46.1% by Eric, and 2.9% by Steve.

NOW THEREFORE, the parties hereby agree as follow:

1.      **Recitals.** The Recitals are incorporated into this Agreement by reference.

2.      **Saugatuck Real Estate Purchase.** Eric and Jim have the right to purchase the real property commonly known as 340 Water Street, Units 1-7 and 9-12, Saugatuck, Michigan (the "**Real Estate**"). Jim hereby assigns his right to purchase the Real Estate to River and Odi. In consideration therefore, River and Odi agrees to pay Jim $150,000 in immediate available.

3.      **Redemptions**.

   a.      Matchbox hereby purchases and redeems, and Jim hereby sells, his 50% membership interest in Matchbox, including without limitation all voting, consent, and financial rights now or hereafter existing and associated with the ownership of such membership interest (such 50% membership interest and rights collectively herein referred to as the "**Matchbox Membership Interest**") to Matchbox, free and clear of all pledges, liens, security interests, encumbrances, mortgages, adverse claims, charges, options, equity interests, proxies, voting agreements or trusts, leases, tenancies, easements, or other interests (collectively, "**Encumbrances**"), except for Encumbrances set forth in Matchbox's operating agreement and that certain option to purchase agreement dated August 1, 2020 between Matchbox and Nathan Orange. Notwithstanding the foregoing, Matchbox, Jim and Eric hereby waive any restrictions and conditions imposed on the foregoing transfer by such operating agreement.

DocuSign Envelope ID: 78C68AAC-3E4C-42CA-84FB-2DE7EF021ECC

      **b.**    OBI hereby purchases and redeems, and Jim hereby sells, his 51% membership interest in OBI, including without limitation all voting, consent, and financial rights now or hereafter existing and associated with the ownership of such membership interest (such 51% membership interest and such corresponding rights collectively herein referred to as the "**OBI Membership Interest**") to OBI, free and clear of Encumbrances. The Matchbox Membership Interest and the OBI Membership Interest are hereby collectively referred to as the "**Purchased Membership Interests**"). Matchbox and OBI are hereby collectively referred to as the "**Redeeming Companies**".

      **4.**    **Call Option**. At any time on or after the Effective Date, so long as no "Event of Default" shall have occurred and remained uncured under the Note (as that term is defined below), Mermaid shall have the right (the "**Call Right**"), but not the obligation, to cause the Jim to sell all of 50% membership interest in Mermaid, including without limitation all voting, consent, and financial rights now or hereafter existing and associated with the ownership of such membership interest (such 50% membership interest and such corresponding rights collectively herein referred to as the "**Mermaid Membership Interest**") to Mermaid, free and clear of Encumbrances except for Encumbrances set forth in Matchbox's operating agreement, for one dollar ($1). Mermaid, Jim and Eric hereby waive any restrictions and conditions imposed on the grant of the Call Right by such operating agreement. The Purchased Membership Interests and the Mermaid Membership Interest are herein collectively referred to as the "**Membership Interests**". Upon exercise of the Call Option, Mermaid shall pledge the Mermaid Membership Interests as collateral for the Note, pursuant to a security agreement – membership interest pledge in substantive form as set forth on Exhibit B.

      **5.**    **Consideration.** As consideration for the transactions contemplated hereunder:

      **a.**    Matchbox agrees to pay to Jim $47,202.08, which amount represents (i) the principal balance and all outstanding interest on the loans from Jim to Matchbox and (ii) payment of outstanding wages owed to Jim from Matchbox.

      **b.**    Mermaid agrees to pay Jim $126,818.60, which amount represents all indebtedness owed by Mermaid to John. Pursuant to subsection (e) below, John hereby agrees that such indebtedness shall be discharged and paid in full by way of such payment to Jim.

      **c.**    Mermaid agrees to pay Jim $76,152.83, which amount represents all indebtedness owed by Mermaid to Robert William. Pursuant to subsection (e) below, Robert William hereby agrees that such indebtedness shall be discharged and paid in full by way of such payment to Jim.

      **d.**    OBI agrees to pay Jim $78,971.25, which amount represents all indebtedness owed by OBI to Robert William. Pursuant to subsection (e) below, Robert William hereby agrees that such indebtedness shall be discharged and paid in full by way of such payment to Jim.

      **e.**    John and Robert William hereby assign their rights to the payments to the

indebtedness referenced in subsections (b) through (d) to Jim.

**f.** The Companies agree to pay Jim the amounts set forth above pursuant to the promissory note ("**Note**") in the form attached hereto as <u>Exhibit A</u>, which will be executed and delivered at the Closing.

**g.** Jim has agreed to assume responsibility and liability for $122,000 owed by the Companies to Gordon Food Services, and shall indemnify and hold the Companies and Eric harmless with respect to same. The Companies agree to pay Jim $122,000 for assuming this liability, and have paid such amount prior to the execution of this Agreement.

6. **Security.** As security for the Note:

**a.** Eric agrees to personally guarantee the Note, pursuant to the Guaranty affixed to the Note, which will be executed and delivered at the Closing.

**b.** The Redeeming Companies shall pledge the Purchased Membership Interests as collateral for the Note, pursuant to the Security Agreement – Membership Interest Pledge attached hereto as <u>Exhibit B</u>, which will be executed and delivered at the Closing.

**c.** The Companies grant Jim a security interest in all of their business assets pursuant to the Security Agreement attached hereto as <u>Exhibit C</u>, which will be executed and delivered at the Closing. The security interest granted thereunder, together with Jim's rights in the Note, shall be subordinate to the security interests of the existing creditors of the Companies with perfected security interests, including without limitation any primary secured lender that extends credit to one or more of the Companies from time to time, or any successor or replacement of such lender (the "**Senior Secured Lender**"). Upon exercise of the Call Option, Mermaid shall grant Jim a security interest in all of Mermaid business assets pursuant to a Security Agreement in substantive form as set forth on <u>Exhibit C</u>.

**d.** In connection with the financing of River and Odi's acquisition of the Saugatuck Real Estate, River and Odi and the Companies have deposited in escrow with ChoiceOne Bank $150,000. As such funds are released by ChoiceOne Bank, they shall be paid to Jim as additional payments of principal under the Note.

7. **Release of Guarantees; Hold Harmless**.

**a.** <u>Guarantees</u>. Eric and the Companies shall promptly, and in all events by July 1, 2022, cause the release of all personal guarantees of Jim with respect to each of the Companies (the "**Existing Guarantees**"), with the exception of the personal guarantee of the approximately $1,290,000 debt owed from Mermaid to Huntington Bank (the "**Huntington Bank Debt**"), which Jim agrees to personally guarantee until the date James Engen executes documentation continuing his personal guaranty of such debt for a period of time which extends to at least November 1, 2022; upon execution of such documentation by James Engen, Eric and the Companies shall promptly, and in all events within 180 days, cause the release of Jim's guarantee of the Huntington Bank Debt. Additionally, Jim agrees to personally guarantee the

3

$1,592,500 debt of River and Odi held at ChoiceOne Bank (the "**River and Odi Guarantee**" and, collectively with the Existing Guarantees, the "**Guarantees**") for a period of five (5) years. In the event Eric and the Companies, or any of them, fail to timely cause the release of any Existing Guarantees of Jim, the interest rate under the Note shall increase to 12% per annum until such time as all Existing Guarantees have been released.

       **b.**   <u>Hold Harmless</u>. In the event that Jim shall pay any amount pursuant to the Guarantees (including costs, judgments, penalties, attorney's fees, and amounts paid in settlement) (the "**Guaranty Payment**"), then Eric and the Companies hereby agree to, jointly and severally, indemnify Jim and to pay to Jim the amount of such Guaranty Payment. If, after demand from Jim, Eric and the Companies fail to pay to Jim the Guaranty Payment within thirty (30) days of demand for same, the Guaranty Payment shall be treated as a loan from Jim to Eric and the Companies from the date of the payment of the Guaranty Payment. Subject to such obligations and restrictions, the loan shall be payable on demand, together with interest from the date of the loan to the date of reimbursement to Jim and bear interest at the rate of twelve percent (12%) per annum or the highest rate permitted by applicable law, whichever is lower.

    **8.**    **Income and Loss Allocations; Distributions**. Taxable income and loss for periods prior to the Effective Date shall be allocated to the members of the Redeeming Companies according to the percentages of their respective membership interests in effect for those time periods. No taxable income or loss of Matchbox or OBI shall be allocated to Jim after the Effective Date. Jim represents and warrants that, except as set forth herein, he is not entitled to any distributions or payments from Matchbox, Mermaid, or OBI, now or in the future, and hereby waives any rights thereto.

    **9.**    **Representations, Warranties and Covenants of Jim**.

       **a.**   Jim represents that he is the record owner of and has good and valid title to the Membership Interests free and clear of all Encumbrances (except as otherwise set forth herein) and has full power and authority to transfer the Purchased Membership Interests in accordance with the provisions of this Agreement and to grant the Call Right to Mermaid.

       **b.**   There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to any Membership Interests or obligating any Company to issue or sell any membership interests (including the Membership Interests), or any other interest, in the Company except for as set forth in the operating agreement for each of the Companies. There are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Membership Interests.

       **c.**   To Jim's actual knowledge, the Companies have no liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise, except (a) those which are adequately reflected or reserved against in the balance sheet of the Companies, and (b) those which have been incurred in the ordinary course of business consistent with past practice.

DocuSign Envelope ID: 78C68AAC-3F4C-43CA-84FB-2DE7EF024EGC

       **d.**      No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement.

      **10.**    **Resignation and Withdrawal**. Jim hereby resigns as an employee and manager of Matchbox, Mermaid, and OBI, and withdraws as a member of Matchbox, Mermaid, and OBI.

      **11.**    **Release**. In consideration of its participation in the transaction evidenced by this Agreement, other than the obligations and covenants of the parties under this Agreement, Jim forever and unconditionally releases, discharges and covenants not to sue Matchbox, Mermaid, and OBI, Matchbox, Mermaid, and OBI's partners, members, managers, agents, affiliates, and Matchbox, Mermaid, and OBI's successors and assigns, for any and all claims, demands obligations, losses, defaults, liabilities, damages, costs, expenses, contributions, or reimbursements of any kind and nature that Jim now has, whether known or unknown, arising out of the business or assets of Matchbox, Mermaid, and OBI, the ownership of the Membership Interest in Matchbox, Mermaid, and OBI, or Jim's employment with Matchbox, Mermaid, or OBI, whether known or unknown, arising out of events occurring prior to the date of this Agreement. In addition, other than the obligations and covenants of the parties under this Agreement, Matchbox, Mermaid, and OBI forever and unconditionally release, discharge and covenant not to sue Jim and Jim's successors and assigns, for any and all claims, demands obligations, losses, defaults, liabilities, damages, costs, expenses, contributions, or reimbursements of any kind and nature that Matchbox, Mermaid, or OBI now has, whether known or unknown, arising out of the business or assets of Matchbox, Mermaid, or OBI, the ownership of the Matchbox, Mermaid, or OBI membership interest, or Jim's employment with Matchbox, Mermaid, or OBI, whether known or unknown, arising out of events occurring prior to the date of this Agreement.

      **12.**    **Indemnification**.

      **a.**      Matchbox, Mermaid, and OBI shall jointly and severally indemnify and defend Jim and each of his affiliates, representatives and agents (the "**Seller Indemnitees**") against, and shall hold each Seller Indemnitee harmless from and against, and shall pay and reimburse each Seller Indemnitee for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of:

         i.      any inaccuracy in or breach of any of the representations or warranties of Matchbox, Mermaid, and OBI contained in this Agreement or in any certificate or instrument delivered by or on behalf of any such party pursuant to this Agreement;

         ii.      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Matchbox, Mermaid, or OBI pursuant to this Agreement;

         iii.      Matchbox, Mermaid, and OBI's ownership after the Closing of the Membership Interest sold by Jim hereunder; or

         iv.      any use of the Matchbox, Mermaid, or OBI's assets after the Closing and the conduct of Matchbox, Mermaid, or OBI's business after the Closing.

b.      Jim shall indemnify and defend each of the Companies and Eric and each of their respective affiliates, representatives and agents (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

i.      any inaccuracy in or breach of any of the representations or warranties of the Companies or Eric contained in this Agreement or in any certificate or instrument delivered by or on behalf of the Companies or Eric pursuant to this Agreement;

ii.      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Jim pursuant to this Agreement;

iii.      Jim's pro rata portion (based on his ownership of the Purchased Membership Interests) of any and all income taxes incurred in connection with the operations of the Companies, to the extent arising out of periods prior to the Effective Date; or

iv.      any claims of Robert William or John arising out of or related to the indebtedness described in Section 5(b)-(d).

c.      Notwithstanding the foregoing, the Companies will have the right to withhold and set off against any amount otherwise due to be paid pursuant to the Note the amount of any Losses to which any Buyer Indemnitee may be entitled under this Section 12 or any other document executed and delivered in connection with this Agreement.

d.      The following terms have the meanings specified or referred to in this Section 12(d):

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

13.      **Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall occur coincident with the execution of this Agreement.

14.      **Miscellaneous.**

a.      **Survival.**  All covenants, warranties, representations, and agreements made

6

by the parties in this Agreement or pursuant to this Agreement shall be deemed and construed to be continuing warranties, representations, covenants and agreements and shall survive the Closing of this Agreement, the execution and delivery of all instruments and documents provided in this Agreement, and any investigation made by any party prior to such time.

    **b.**    **Actions after Closing**. Subsequent to the execution of this Agreement, each party shall, at the reasonable request of any other party, furnish, execute and deliver such documents, instruments, opinions, accounts or certificates, notices or other further assurances as the requesting party shall reasonably require as necessary or desirable to effect the consummation of this Agreement.

    **c.**    **Equitable Remedy**.  The assets transferred hereunder are not readily marketable and are unique. In the event of the failure by any party to complete the transactions contemplated hereunder, the aggrieved party/parties shall be entitled to have recourse in a suit in equity for specific performance of the terms and conditions of this Agreement.

    **d.**    **Assignment.**  This Agreement shall not be assignable by any party without the prior written consent of the other parties hereto.

    **e.**    **Successors and Assigns.**  All the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and shall be enforceable by the respective heirs, beneficiaries, personal representatives, successors and assigns of the parties to this Agreement.

    **f.**    **Entire Agreement.**  This Agreement sets forth the entire understanding of the parties and supersedes all prior agreements, arrangements and other understandings whether written or oral. This Agreement will be amended only by written instrument signed by both of the parties to this Agreement.

    **g.**    **Severability.**  The unenforceability of any provision of this Agreement shall not affect the enforceability of the remaining provisions of this Agreement. If any court determines that any provision of this Agreement is excessive in duration or scope or is unreasonable or unenforceable under the laws of that state, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state.

    **h.**    **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

    **i.**    **Counterparts.**  This Agreement may be executed simultaneously and several counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument.

    **j.**    **Notices and Payments**. All notices and demands required or permitted by this Agreement shall be in writing addressed to the relevant address set forth below or such other

DocuSign Envelope ID: 78C68AAC-3F4C-43CA-84FB-2DE7EF024EGC

relevant address as may be specified in writing by the relevant party. All notices, demands, and payments required or permitted by this Note shall be deemed properly made: (i) upon personal delivery by hand; (ii) 3 business days after deposit in the United States mail, postage prepaid, registered or certified mail, together with delivery by email; or (iii) 1 business day after deposit with a recognized overnight courier, postage prepaid, together with delivery by email. Proof of sending any notice, demand, or payment shall be the responsibility of the sender:

If to Jim:

James Bultema
2924 Pioneer Club Road SE
Grand Rapids, MI 49506
Email: jrbultema@gmail.com

If to Eric or any of the Companies:

Eric Chaitin
6354 Riverside Rd
Fennville, MI 49408
Attention: Eric A. Chaitin
Email: eric@riverandodi.com

[Signatures on following page.]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**JIM:**

_____
James R. Bultema

**ERIC:**

_____
Eric A. Chaitin

**JOHN:**

_____
John Bultema

**ROBERT WILLIAM:**

Robert William, LLC

By: _____
Name: James R. Bultema
Its:      Member

**MATCHBOX:**

Matchbox Business LLC,

By: _____
Name: Eric Chaitin
Its:      Manager

**MERMAID:**

Mermaid Business LLC,

By: _____
Name: Eric Chaitin
Its:      Manager

**OBI:**

OBI Business L.L.C.,

By: _____
Name: Eric Chaitin
Its:      Manager

**RIVER AND ODI:**

River and Odi Properties LLC,

By: _____
Name: Eric Chaitin
Its:      Manager

9

DocuSign Envelope ID: 78C68AAC-3E4C-43CA-84FB-2DE7FF024ECC

Exhibit A

Note

[See attached.]

DocuSign Envelope ID: 78C68AAC-3F4C-43CA-84FB-2DE7EF024EGC

Exhibit B

Security Agreement – Membership Interest Pledge

[See attached.]

DocuSign Envelope ID: 78C68AAC-3E4C-43CA-84FB-2DE7FF024EGC

Exhibit C

Security Agreement

[See attached.]

As of October 13, 2020                                              **EXHIBIT E**

**PAYCHECK PROTECTION PROGRAM**
Frequently Asked Questions (FAQs) on PPP Loan Forgiveness

The Small Business Administration (SBA), in consultation with the Department of the Treasury, is providing this guidance to address borrower and lender questions concerning forgiveness of Paycheck Protection Program (PPP) loans, as provided for under section 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), as amended by the Paycheck Protection Program Flexibility Act (Flexibility Act).

Borrowers and lenders may rely on the guidance provided in this document as SBA's interpretation, in consultation with the Department of the Treasury, of the CARES Act, the Flexibility Act, and the Paycheck Protection Program Interim Final Rules ("PPP Interim Final Rules") (link).

## General Loan Forgiveness FAQs

1. **Question:**  Which loan forgiveness application should sole proprietors, independent contractors, or self-employed individuals with no employees complete?

   **Answer:**  Sole proprietors, independent contractors, and self-employed individuals who had no employees at the time of the PPP loan application and did not include any employee salaries in the computation of average monthly payroll in the Borrower Application Form automatically qualify to use the Loan Forgiveness Application Form 3508EZ or lender equivalent and should complete that application.

2. **Question:**  Can PPP lenders use scanned copies of documents, E-signatures, or E-consents for loan forgiveness applications and loan forgiveness documentation?

   **Answer:**  Yes.  All PPP lenders may accept scanned copies of signed loan forgiveness applications and documents containing the information and certifications required by SBA Form 3508, 3508EZ, or lender equivalent.  Lenders may accept any form of E-consent or E-signature that complies with the requirements of the Electronic Signatures in Global and National Commerce Act (P.L. 106-229).

   If electronic signatures are not feasible, then when obtaining a wet ink signature without in-person contact, lenders should take appropriate steps to ensure the proper party has executed the document.

   This guidance does not supersede signature requirements imposed by other applicable law, including by the lender's primary federal regulator.

3. **Question:**  If a borrower submits a timely loan forgiveness application, does the borrower have to make any payments on its loan prior to SBA remitting the forgiveness amount, if any?

   **Answer:**  As long as a borrower submits its loan forgiveness application within ten months of the completion of the Covered Period (as defined below), the borrower is not

1

As of October 13, 2020

required to make any payments until the forgiveness amount is remitted to the lender by SBA.  If the loan is fully forgiven, the borrower is not responsible for any payments.  If only a portion of the loan is forgiven, or if the forgiveness application is denied, any remaining balance due on the loan must be repaid by the borrower on or before the maturity date of the loan.  Interest accrues during the time between the disbursement of the loan and SBA remittance of the forgiveness amount.  The borrower is responsible for paying the accrued interest on any amount of the loan that is not forgiven.  The lender is responsible for notifying the borrower of remittance by SBA of the loan forgiveness amount (or that SBA determined that no amount of the loan is eligible for forgiveness) and the date on which the borrower's first payment is due, if applicable.

4.  **Question:**  The PPP loan forgiveness application forms (3508, 3508EZ, and 3508S) display an expiration date of 10/31/2020 in the upper-right corner.  Is October 31, 2020 the deadline for borrowers to apply for forgiveness?

**Answer:**  No.  Borrowers may submit a loan forgiveness application any time before the maturity date of the loan, which is either two or five years from loan origination.

However, if a borrower does not apply for loan forgiveness within 10 months after the last day of the borrower's loan forgiveness covered period, loan payments are no longer deferred and the borrower must begin making payments on the loan.  For example, a borrower whose covered period ends on October 30, 2020 has until August 30, 2021 to apply for forgiveness before loan repayment begins.

The expiration date in the upper-right corner of the posted PPP loan forgiveness application forms is displayed for purposes of SBA's compliance with the Paperwork Reduction Act, and reflects the temporary expiration date for approved use of the forms.  This date will be extended, and when approved, the same forms with the new expiration date will be posted.[1]

## Loan Forgiveness Payroll Costs FAQs

1.  **Question:**  Are payroll costs that were incurred during the Covered Period[2] or the Alternative Payroll Covered Period[3] but paid after the Covered Period or the Alternative Payroll Covered Period eligible for loan forgiveness?

---

[1] All questions and answers published August 4, 2020 unless specified otherwise.  General Loan Forgiveness FAQ 4 published October 13, 2020.

[2] The Covered Period is either (1) the 24-week (168-day) period beginning on the PPP loan disbursement date, or (2) if the borrower received its PPP loan before June 5, 2020, the borrower may elect to use an eight-week (56-day) Covered Period.  For example, if the borrower is using a 24-week Covered Period and received its PPP loan proceeds on Monday, April 20, the first day of the Covered Period is April 20 and the last day of the Covered Period is Sunday, October 4.  In no event may the Covered Period extend beyond December 31, 2020.

[3] Borrowers with a biweekly (or more frequent) payroll schedule may elect to calculate eligible payroll costs using the 24-week (168-day) period (or for loans received before June 5, 2020 at the election of the borrower, the eight-week (56-day) period) that begins on the first day of their first pay period following their PPP loan disbursement date (i.e., the "Alternative Covered Period").  For example, if the borrower is using a 24-week Alternative Payroll Covered Period and received its PPP loan proceeds on Monday, April 20, and the first day of its first pay period

As of October 13, 2020

**Answer:**  Yes, if the payroll costs are paid on or before the next regular payroll date after the Covered Period or Alternative Payroll Covered Period.

Example:  A borrower received its loan before June 5, 2020 and elects to use a 24-week Covered Period.  The borrower's Covered Period runs from Monday, April 20 through Sunday, October 4.  The borrower has a biweekly payroll cycle, with a pay period ending on Sunday, October 4.  However, the borrower will not make the corresponding payroll payment until the next regular payroll date of Friday, October 9.  Under these circumstances, the borrower incurred payroll costs during the Covered Period and may seek loan forgiveness for the payroll costs paid on October 9 because the cost was incurred during the Covered Period and payment was made on the first regular payroll date after the Covered Period.

2.  **Question:**  Are payroll costs that were incurred before the Covered Period but paid during the Covered Period eligible for loan forgiveness?

**Answer:**  Yes.

Example:  A borrower received its loan before June 5, 2020 and elects to use a 24-week Covered Period.  The borrower's Covered Period runs from Monday, April 20 through Sunday, October 4.  The borrower has a biweekly payroll cycle, with a payroll cycle ending on Saturday, April 18.  The borrower will not make the corresponding payroll payment until Friday, April 24.  While these payroll costs were not incurred during the Covered Period, they were paid during the Covered Period and are therefore eligible for loan forgiveness.

3.  **Question:**  Are borrowers required to calculate payroll costs for partial pay periods?

**Answer:**  If the borrower uses a biweekly or more frequent (e.g., weekly) payroll cycle, the borrower may elect to calculate eligible payroll costs using the eight-week (for borrowers that received their loans before June 5, 2020 and elect this Covered Period length) or 24-week period that begins on the first day of the first payroll cycle following the PPP Loan Disbursement Date (referred to as the Alternative Payroll Covered Period).  However, if a borrower pays twice a month or less frequently, it will need to calculate payroll costs for partial pay periods.  The Covered Period or Alternative Covered Period for any borrower will end no later than December 31, 2020.

Example:  A borrower uses a biweekly payroll cycle.  The borrower's 24-week Covered Period begins on Monday, June 1 and ends on Sunday, November 15.  The first day of the borrower's first payroll cycle that starts in the Covered Period is June 7.  The borrower may elect an Alternative Payroll Covered Period that starts on June 7 and ends on November 21 (167 days later).  Payroll costs incurred (i.e., the pay was earned on that

---

following its PPP loan disbursement is Sunday, April 26, the first day of the Alternative Payroll Covered Period is April 26 and the last day of the Alternative Payroll Covered Period is Saturday, October 10.  In no event may the Alternative Payroll Covered Period extend beyond December 31, 2020.

As of October 13, 2020

day) during this Alternative Payroll Covered Period are eligible for loan forgiveness if the last payment is made on or before the first regular payroll date after November 21.

**4. Question:** For purposes of calculating cash compensation, should borrowers use the gross amount before deductions for taxes, employee benefits payments, and similar payments, or the net amount paid to employees?

**Answer:** The gross amount should be used when calculating cash compensation.

**5. Question:** Are only salaries or wages covered by loan forgiveness, or can a borrower pay lost tips, lost commissions, bonuses, or other forms of incentive pay and have such costs qualify for loan forgiveness?

**Answer:** Payroll costs include all forms of cash compensation paid to employees, including tips, commissions, bonuses, and hazard pay. Note that forgivable cash compensation per employee is limited to $100,000 on an annualized basis.

**6. Question:** What expenses for group health care benefits will be considered payroll costs that are eligible for loan forgiveness?

**Answer:** Employer expenses for employee group health care benefits that are paid or incurred by the borrower during the Covered Period or the Alternative Payroll Covered Period are payroll costs eligible for loan forgiveness. However, payroll costs do not include expenses for group health care benefits paid by employees (or beneficiaries of the plan) either pre-tax or after tax, such as the employee share of their health care premium. Forgiveness is not provided for expenses for group health benefits accelerated from periods outside the Covered Period or Alternative Payroll Covered Period.

If a borrower has an insured group health plan, insurance premiums paid or incurred during the Covered Period or Alternative Payroll Covered Period qualify as "payroll costs," as long as the premiums are paid during the applicable period or by the next premium due date after the end of the applicable period. As noted, only the portion of the premiums paid by the borrower for coverage during the applicable Covered Period or Alternative Payroll Covered Period is included, not any portion paid by employees or beneficiaries or any portion paid for coverage for periods outside the applicable period. Loan Forgiveness Payroll Costs FAQ 8 outlines the rules that apply to owner health insurance.

**7. Question:** What contributions for retirement benefits will be considered payroll costs that are eligible for loan forgiveness?

**Answer:** Generally, employer contributions for employee retirement benefits that are paid or incurred by the borrower during the Covered Period or Alternative Payroll Covered Period qualify as "payroll costs" eligible for loan forgiveness. The employer contributions for retirement benefits included in the loan forgiveness amount as payroll costs cannot include any retirement contributions deducted from employees' pay or otherwise paid by employees. Forgiveness is not provided for employer contributions for

As of October 13, 2020

retirement benefits accelerated from periods outside the Covered Period or Alternative Covered Period.  Loan Forgiveness Payroll Costs FAQ 8 outlines the treatment of retirement benefits for owners, which are different from this general approach.

8.  **Question:**  How is the amount of owner compensation that is eligible for loan forgiveness determined?

**Answer:**  The amount of compensation of owners who work at their business that is eligible for forgiveness depends on the business type and whether the borrower is using an eight-week or 24-week Covered Period.  In addition to the specific caps described below, the amount of loan forgiveness requested for owner-employees and self-employed individuals' payroll compensation is capped at $20,833 per individual in total across all businesses in which he or she has an ownership stake.  For borrowers that received a PPP loan before June 5, 2020 and elect to use an eight-week Covered Period, this cap is $15,385.  If their total compensation across businesses that receive a PPP loan exceeds the cap, owners can choose how to allocate the capped amount across different businesses.  The examples below are for a borrower using a 24-week Covered Period.

C Corporations:  The employee cash compensation of a C-corporation owner-employee, defined as an owner who is also an employee (including where the owner is the only employee), is eligible for loan forgiveness up to the amount of 2.5/12 of his or her 2019 employee cash compensation, with cash compensation defined as it is for all other employees.  Borrowers are also eligible for loan forgiveness for payments for employer state and local taxes paid by the borrowers and assessed on their compensation, for the amount paid by the borrower for employer contributions for their employee health insurance, and for employer retirement contributions to their employee retirement plans capped at the amount of 2.5/12 of the 2019 employer retirement contribution.  Payments other than for cash compensation should be included on lines 6-8 of PPP Schedule A of the loan forgiveness application (SBA Form 3508 or lender equivalent), for borrowers using that form, and do not count toward the $20,833 cap per individual.

S Corporations:  The employee cash compensation of an S-corporation owner-employee, defined as an owner who is also an employee, is eligible for loan forgiveness up to the amount of 2.5/12 of their 2019 employee cash compensation, with cash compensation defined as it is for all other employees.  Borrowers are also eligible for loan forgiveness for payments for employer state and local taxes paid by the borrowers and assessed on their compensation, and for employer retirement contributions to their employee retirement plans capped at the amount of 2.5/12 of their 2019 employer retirement contribution. Employer contributions for health insurance are not eligible for additional forgiveness for S-corporation employees with at least a 2% stake in the business, including for employees who are family members of an at least 2% owner under the family attribution rules of 26 U.S.C. 318, because those contributions are included in cash compensation. The eligible non-cash compensation payments should be included on lines 7 and 8 of PPP Schedule A of the Loan Forgiveness Application (SBA Form 3508), for borrowers using that form, and do not count toward the $20,833 cap per individual.

As of October 13, 2020

<u>Self-employed Schedule C (or Schedule F) filers</u>:  The compensation of self-employed Schedule C (or Schedule F) individuals, including sole proprietors, self-employed individuals, and independent contractors, that is eligible for loan forgiveness is limited to 2.5/12 of 2019 net profit as reported on IRS Form 1040 Schedule C line 31 (or 2.5/12 of 2019 net farm profit, as reported on IRS Form 1040 Schedule F line 34) (or for new businesses, the estimated 2020 Schedule C (or Schedule F) referenced in question 10 of "Paycheck Protection Program: How to Calculate Maximum Loan Amounts – By Business Type"[4]).  Separate payments for health insurance, retirement, or state or local taxes are not eligible for additional loan forgiveness; health insurance and retirement expenses are paid out of their net self-employment income.  If the borrower did not submit its 2019 IRS Form 1040 Schedule C (or F) to the Lender when the borrower initially applied for the loan, it must be included with the borrower's forgiveness application.

<u>General Partners</u>:  The compensation of general partners that is eligible for loan forgiveness is limited to 2.5/12 of their 2019 net earnings from self-employment that is subject to self-employment tax, which is computed from 2019 IRS Form 1065 Schedule K-1 box 14a (reduced by box 12 section 179 expense deduction, unreimbursed partnership expenses deducted on their IRS Form 1040 Schedule SE, and depletion claimed on oil and gas properties) multiplied by 0.9235.[5]  Compensation is only eligible for loan forgiveness if the payments to partners are made during the Covered Period or Alternative Payroll Covered Period.  Separate payments for health insurance, retirement, or state or local taxes are not eligible for additional loan forgiveness.  If the partnership did not submit its 2019 IRS Form 1065 K-1s when initially applying for the loan, it must be included with the partnership's forgiveness application.

<u>LLC owners</u>:  LLC owners must follow the instructions that apply to how their business was organized for tax filing purposes for tax year 2019, or if a new business, the expected tax filing situation for 2020.

## Loan Forgiveness Nonpayroll Costs FAQs

1.  **Question:**  Are nonpayroll costs incurred prior to the Covered Period, but paid during the Covered Period, eligible for loan forgiveness?

    **Answer:**  Yes, eligible business mortgage interest costs, eligible business rent or lease costs, and eligible business utility costs incurred prior to the Covered Period and paid during the Covered Period are eligible for loan forgiveness.

    <u>Example</u>:  A borrower's 24-week Covered Period runs from April 20 through October 4. On May 4, the borrower receives its electricity bill for April.  The borrower pays its April electricity bill on May 8.  Although a portion of the electricity costs were incurred

---

[4] https://www.sba.gov/sites/default/files/2020-06/How-to-Calculate-Loan-Amounts-508_1.pdf.
[5] This treatment follows the computation of self-employment tax from IRS Form 1040 Schedule SE Section A line 4 and removes the "employer" share of self-employment tax, consistent with how payroll costs for employees in the partnership are determined.

As of October 13, 2020

before the Covered Period, these electricity costs are eligible for loan forgiveness because they were paid during the Covered Period.

2. **Question:**  Are nonpayroll costs incurred during the Covered Period, but paid after the Covered Period, eligible for loan forgiveness?

   **Answer:**  Nonpayroll costs are eligible for loan forgiveness if they were incurred during the Covered Period and paid on or before the next regular billing date, even if the billing date is after the Covered Period.

   Example:  A borrower's 24-week Covered Period runs from April 20 through October 4. On October 6, the borrower receives its electricity bill for September.  The borrower pays its September electricity bill on October 16.  These electricity costs are eligible for loan forgiveness because they were incurred during the Covered Period and paid on or before the next regular billing date (November 6).

3. **Question:**  If a borrower elects to use the Alternative Payroll Covered Period for payroll costs, does the Alternative Payroll Covered Period apply to nonpayroll costs?

   **Answer:**  No.  The Alternative Payroll Covered Period applies only to payroll costs, not to nonpayroll costs.  The Covered Period always starts on the date the lender makes a disbursement of the PPP loan.  Nonpayroll costs must be paid or incurred during the Covered Period to be eligible for loan forgiveness.  For payroll costs only, the borrower may elect to use the Alternative Payroll Covered Period to align with its biweekly or more frequent payroll schedule.

4. **Question:**  Is interest on unsecured credit eligible for loan forgiveness?

   **Answer:**  No.  Payments of interest on business mortgages on real or personal property (such as an auto loan) are eligible for loan forgiveness.  Interest on unsecured credit is not eligible for loan forgiveness because the loan is not secured by real or personal property. Although interest on unsecured credit incurred before February 15, 2020 is a permissible use of PPP loan proceeds, this expense is not eligible for forgiveness.

5. **Question:**  Are payments made on recently renewed leases or interest payments on refinanced mortgage loans eligible for loan forgiveness if the original lease or mortgage existed prior to February 15, 2020?

   **Answer:**  Yes.  If a lease that existed prior to February 15, 2020 expires on or after February 15, 2020 and is renewed, the lease payments made pursuant to the renewed lease during the Covered Period are eligible for loan forgiveness.  Similarly, if a mortgage loan on real or personal property that existed prior to February 15, 2020 is refinanced on or after February 15, 2020, the interest payments on the refinanced mortgage loan during the Covered Period are eligible for loan forgiveness.

   Example:  A borrower entered into a five-year lease for its retail space in March 2015. The lease was renewed in March 2020.  For purposes of determining forgiveness of the

As of October 13, 2020

borrower's PPP loan, the March 2020 renewed lease is deemed to be an extension of the original lease, which was in force before February 15, 2020. As a result, the lease payments made under the renewed lease during the Covered Period are eligible for loan forgiveness.

6. **Question:** Covered utility payments, which are eligible for forgiveness, include a "payment for a service for the distribution of . . . transportation" under the CARES Act. What expenses does this category include?

   **Answer:** A service for the distribution of transportation refers to transportation utility fees assessed by state and local governments. Payment of these fees by the borrower is eligible for loan forgiveness.[6]

7. **Question:** Are electricity supply charges eligible for loan forgiveness if they are charged separately from electricity distribution charges?

   **Answer:** Yes. The entire electricity bill payment is eligible for loan forgiveness (even if charges are invoiced separately), including supply charges, distribution charges, and other charges such as gross receipts taxes.

## Loan Forgiveness Reductions FAQs

1. **Question:** Will a borrower be subject to a reduction to its forgiveness amount due to a reduction in FTE employees during the Covered Period if the borrower offered to rehire one or more laid off employees but the employees declined?

   **Answer:** In calculating its loan forgiveness amount, a borrower may exclude any reduction in FTE employees if the borrower is able to document in good faith the following: (1) an inability to rehire individuals who were employees of the borrower on February 15, 2020 and (2) an inability to hire similarly qualified individuals for unfilled positions on or before December 31, 2020. Borrowers are required to inform the applicable state unemployment insurance office of any employee's rejected rehire offer within 30 days of the employee's rejection of the offer. The documents that borrowers should maintain to show compliance with this exemption include the written offer to rehire an individual, a written record of the offer's rejection, and a written record of efforts to hire a similarly qualified individual.

2. **Question:** If a seasonal employer elects to use a 12-week period between May 1, 2019 and September 15, 2019 to calculate its maximum PPP loan amount, what period in 2019 should be used as the reference period for calculating any reductions in the loan forgiveness amount?

   **Answer:** A seasonal employer that elects to use a 12-week period between May 1, 2019 and September 15, 2019 to calculate its maximum PPP loan amount must use the same

---

[6] For more information on transportation utility fees, see
https://www.fhwa.dot.gov/ipd/value_capture/defined/transportation_utility_fees.aspx.

As of October 13, 2020

    12-week period as the reference period for calculation of any reduction in the amount of loan forgiveness.

3. **Question:**  When calculating the FTE Reduction Exceptions in Table 1 of the PPP Schedule A Worksheet on the Loan Forgiveness Application (SBA Form 3508 or lender equivalent), do borrowers include employees who made more than $100,000 in 2019 (those listed in Table 2 of the PPP Schedule A Worksheet)?

    **Answer:**  Yes.  The FTE Reduction Exceptions apply to all employees, not just those who would be listed in Table 1 of the Loan Forgiveness Application (SBA Form 3508 or lender equivalent).  Borrowers should therefore include employees who made more than $100,000 in the FTE Reduction Exception line in Table 1 of the PPP Schedule A Worksheet.

4. **Question:**  How do borrowers calculate the reduction in their loan forgiveness amount arising from reductions in employee salary or hourly wage?

    **Answer:**  Certain pay reductions during the Covered Period or the Alternative Payroll Covered Period may reduce the amount of loan forgiveness a borrower will receive.  If the salary or hourly wage of a covered employee[7] is reduced by more than 25% during the Covered Period or the Alternative Payroll Covered Period, the portion in excess of 25% reduces the eligible forgiveness amount unless the borrower satisfies the Salary/Hourly Wage Reduction Safe Harbor (as described in the Loan Forgiveness Application (SBA Form 3508 or lender equivalent)).  The examples below assume that each employee is a "covered employee."

    Example 1:  A borrower received its PPP loan before June 5, 2020 and elected to use an eight-week covered period.  Its full-time salaried employee's pay was reduced during the Covered Period from $52,000 per year to $36,400 per year on April 23, 2020 and not restored by December 31, 2020.  The employee continued to work on a full-time basis with a full-time equivalency (FTE) of 1.0.  The borrower should refer to the "Salary/Hourly Wage Reduction" section under the "Instructions for PPP Schedule A Worksheet" in the PPP Loan Forgiveness Application Instructions.  In Step 1, the borrower enters the figures in 1.a, 1.b, and 1.c, and because annual salary was reduced by more than 25%, the borrower proceeds to Step 2.  Under Step 2, because the salary reduction was not remedied by December 31, 2020, the Salary/Hourly Wage Reduction Safe Harbor is not met, and the borrower is required to proceed to Step 3.  Under Step 3.a., $39,000 (75% of $52,000) is the minimum salary that must be maintained to avoid a penalty.  Salary was reduced to $36,400, and the excess reduction of $2,600 is entered in Step 3.b.  Because this employee is salaried, in Step 3.e., the borrower would multiply the excess reduction of $2,600 by 8 (if it had instead selected a 24-week Covered Period, it would multiply by 24) and divide by 52 to arrive at a loan

___
[7] A "covered employee" is an individual who: (1) was employed by the borrower at any point during the Covered Period or Alternative Payroll Covered Period and whose principal place of residence is in the United States; and (2) received compensation from the borrower at an annualized rate less than or equal to $100,000 for all pay periods in 2019 or was not employed by the borrower at any point in 2019.

As of October 13, 2020

forgiveness reduction amount of $400.  The borrower would enter on the PPP Schedule A Worksheet, Table 1, $400 as the salary/hourly wage reduction in the column above box 3 for that employee.

<u>Example 2</u>:  A borrower received its PPP loan before June 5, 2020 and elected to use a 24-week Covered Period.  An hourly employee's hourly wage was reduced from $20 per hour to $15 per hour during the Covered Period.  The employee worked 10 hours per week between January 1, 2020 and March 31, 2020.  The borrower should refer to the "Salary/Hourly Wage Reduction" section under the "Instructions for PPP Schedule A Worksheet" in the PPP Loan Forgiveness Application Instructions.  Because the employee's hourly wage was reduced by exactly 25% (from $20 per hour to $15 per hour), the wage reduction does not reduce the eligible forgiveness amount.  The amount on line 1.c would be 0.75 or more, so the borrower would enter $0 in the Salary/Hourly Wage Reduction column for that employee on the PPP Schedule A Worksheet, Table 1.

If the same employee's hourly wage had been reduced to $14 per hour, the reduction would be more than 25%, and the borrower would proceed to Step 2.  If that reduction were not remedied as of December 31, 2020, the borrower would proceed to Step 3.  This reduction in hourly wage in excess of 25% is $1 per hour.  In Step 3, the borrower would multiply $1 per hour by 10 hours per week to determine the weekly salary reduction.  The borrower would then multiply the weekly salary reduction by 24 (because the borrower is using a 24-week Covered Period).  The borrower would enter $240 in the Salary/Hourly Wage Reduction column for that employee on the PPP Schedule A Worksheet, Table 1.  If the borrower applies for forgiveness before the end of the 24-week Covered Period, it must account for the salary reduction (the excess reduction over 25%, or $240) for the full 24-week Covered Period.

<u>Example 3</u>:  An employee earned a wage of $20 per hour between January 1, 2020 and March 31, 2020 and worked 40 hours per week.  During the Covered Period, the employee's wage was not changed, but his or her hours were reduced to 25 hours per week.  In this case, the salary/hourly wage reduction for that employee is zero, because the hourly wage was unchanged.  As a result, the borrower would enter $0 in the Salary/Hourly Wage Reduction column for that employee on the PPP Schedule A Worksheet, Table 1.  The employee's reduction in hours would be taken into account in the borrower's calculation of its FTE during the Covered Period, which is calculated separately and may result in a reduction of the borrower's loan forgiveness amount.

5. **Question:**  For purposes of calculating the loan forgiveness reduction required for salary/hourly wage reductions in excess of 25% for certain employees, are all forms of compensation included or only salaries and wages?

   **Answer:**  For purposes of calculating reductions in the loan forgiveness amount, the borrower should only take into account decreases in salaries or wages.

As of October 13, 2020

**Economic Injury Disaster Loan (EIDL) FAQs**

1. **Question:**  SBA will deduct the amount of any Economic Injury Disaster Loan (EIDL) advance received by a PPP borrower from the forgiveness amount remitted to the lender.  How will a lender know the amount of the EIDL advance that will be automatically deducted by SBA?

   **Answer:**  If a borrower received an EIDL advance, SBA is required to reduce the borrower's loan forgiveness amount by the amount of the EIDL advance.  SBA will deduct the amount of the EIDL advance from the forgiveness amount remitted by SBA to the lender.  The lender will be able to confirm the amount of the EIDL advance that will be automatically deducted by SBA from the forgiveness payment by reviewing the borrower's EIDL advance information in the PPP Forgiveness Platform.

2. **Question:**  How should a lender handle any remaining balance due on a PPP loan after SBA remits the forgiveness amount to the lender?

   **Answer:**  If a PPP loan is not forgiven in full (including if there has been a reduction in the forgiveness amount for an EIDL advance), any remaining balance due on the PPP loan must be repaid by the borrower.  The lender is responsible for notifying the borrower of the loan forgiveness amount remitted by SBA and the date on which the borrower's first loan payment is due.  The lender must continue to service the loan.  The borrower must repay the remaining loan balance by the maturity date of the PPP loan (either two or five years).  If a borrower is determined to have been ineligible for a PPP loan for any reason, SBA may seek repayment of the outstanding PPP loan balance or pursue other available remedies.

3. **Question:**  What should a lender do if a borrower received an EIDL advance in excess of the amount of its PPP loan?

   **Answer:**  A borrower that received an EIDL advance in excess of the amount of its PPP loan will not receive any forgiveness on the PPP loan, because the amount of an EIDL advance is deducted from the PPP loan forgiveness amount.  The lender is responsible for notifying the borrower of the date on which the borrower's first loan payment is due.  The lender must continue to service the loan.  The borrower must repay the remaining loan balance by the maturity date of the PPP loan (either two or five years).  If a borrower is determined to have been ineligible for a PPP loan for any reason, SBA may seek repayment of the outstanding PPP loan balance or pursue other available remedies.[8]

---

[8] All questions and answers published August 4, 2020 unless specified otherwise.  EIDL FAQs 1 – 3 published August 11, 2020.